.UNITED STATES of America,
Plaintiff–Appellee,

v.

Sandra REAVIS, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Lance THOMAS, a/k/a Anthony Mack, Defendant–Appellant.

Nos. 93–5329, 93–5542.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 30, 1994.

Decided Feb. 21, 1995.

**ARGUED:** Robert James Wagner, Wagner & Wagner, Richmond, VA, for appellant Reavis; Reginald Moore Barley, Richmond, VA, for appellant Thomas. Justin W. Williams, Asst. U.S. Atty., Alexandria, VA, for appellee. **ON BRIEF:** Helen F. Fahey, U.S. Atty., Karen E. McSweeney, Sp. Asst. U.S. Atty., Alexandria, VA, for appellee.

Before ERVIN, Chief Judge, WILKINSON, Circuit Judge, and PHILLIPS, Senior Circuit Judge.

No. 93–5329 affirmed and No. 93–5542 affirmed in part remanded with instructions by published opinion. Chief Judge ERVIN wrote the opinion, in which Judge WILKINSON and Senior Judge PHILLIPS joined.

## OPINION

ERVIN, Chief Judge:

Defendants Sandra Reavis and Lance Thomas, tried separately on numerous charges stemming from their joint participation in a Richmond, Virginia drug ring, appeal their convictions on several grounds. Reavis, who was found guilty of conspiracy in violation of 21 U.S.C. § 846, received a sentence of 192 months in prison. She claims that the district court erred in refusing to sever her trial from that of several of her co-conspirators and that her sentence should have been reduced because she was no more than a minor or minimal participant in the drug operation. Thomas, who was also convicted of section 846 conspiracy, faces a sentence of life imprisonment plus twenty-five years based on convictions for membership in a continuing criminal enterprise, use of a firearm in a drug trafficking crime, possession of crack cocaine with intent to distribute, and committing or aiding and abetting violent crimes in aid of racketeering. Thomas argues that his convictions violated the Speedy Trial Act, 18 U.S.C. § 3161(c), and that insufficient evidence existed to convict him on several of the murder and maiming charges. We find no error to have been

committed on any of the grounds suggested by the appellants and, therefore, affirm.

## I.

Reavis and Thomas were members of a drug ring that operated in Richmond, Virginia in 1991 and 1992. Before the police arrested the principal players in the conspiracy, the group had committed a total of ten murders related to their drug activities. Reavis and Thomas were not tried together, and because the extent of their criminal activity differs, it is best to review the facts regarding their cases separately.

Testimony during Reavis' trial revealed that Reavis had played a significant role in the activities of the drug conspiracy. Several witnesses testified that she was involved in the possession, distribution, and sale of crack cocaine. Witnesses Jeanette Pauley and Greg Noble each admitted purchasing cocaine from Reavis, and the jury learned from witness Ronita Hollman that the crack cocaine sold by Reavis was obtained from one of the drug ring's leaders, James Roane. Other witnesses testified that Reavis also received drugs from other ring leaders such as Cory Johnson and Richard Tipton. Reavis was more than a mere seller, however. Other witnesses labelled her a "partner" in the conspiracy, and Reavis' activities support this label. Reavis wired money to Cory Johnson to facilitate his release from jail, hid guns for fellow conspirators, and delivered messages to ring "workers" from the conspiracy's leaders. Her romantic relationship with leader Roane apparently fueled her involvement in the conspiracy, which culminated in her being viewed as one of the drug ring's "enforcers." See Trial Transcript at 1720 (witness testifying that one of the drug ring's partners, Cory Johnson, "wanted me to kill 'Mousey' or he was going to have Sandra [Reavis] kill me").

The charges brought against Thomas were far more extensive than those that Reavis faced. Thomas was one of the four principal players in the Richmond drug ring, a member of a tightly-knit "family" that controlled the Richmond operation. In a clear demarcation of leadership, Thomas was classified as one of the ring's "partners" who oversaw the actions of the ring's many workers. Substantial evidence presented at Thomas' trial implicated him in a majority of the drug ring's most violent actions. On January 29, 1992, Louis Johnson was murdered for allegedly harassing one of the drug ring's workers. A member of the drug ring who was present at the murder testified that Thomas "pulled a gun out of his pocket and shot him [Johnson] ... in the head." Three days later, as a gesture of solidarity towards his partner, James Roane, Thomas participated in the murder of Torrick Brown and the maiming of Martha McCoy. Roane, Thomas, and Johnson shot Brown sixteen times and McCoy, who was in Brown's house at the time, six times.

One week later, Thomas was arrested in a drug raid, and it appeared that the group's reign of terror was finally over. Also arrested in that raid was Linwood Chiles, one of the drug ring's workers. Chiles spent very little time in jail, and when Thomas heard that Chiles would be testifying against him, Thomas asked one of his partners on the "outside," Cory Johnson, to take care of the potential witness. On February 19, 1992, Chiles was murdered, shot in the head twice while sitting in his car. Unfortunately, three other people were in the car with Chiles at the time, and they also felt the drug ring's wrath. One of those person's, Curtis Thorne, was shot to death. The two other passengers, Gwendolyn Greene and Priscilla Greene, survived the shooting, although one is paralyzed and the other suffered a partial loss of brain tissue.

## II.

Reavis argues that the trial court erred in denying her motion to have her trial severed from that of her co-defendants and in refusing to label her a minor or minimal participant in the drug conspiracy for sentencing purposes. We address each of her contentions at this time.

## A.

Reavis contests the district court's denial of her motion to have her trial severed from that of her co-defendants, alleging prejudice

from the joint trial. Specifically, Reavis argues that one of her co-defendants, James Roane, would have testified that Reavis did not actively participate in the conspiracy and knew nothing about the murderous activities of the Richmond drug ring. According to Roane's attorney, the only way Roane would have testified on Reavis' behalf, however, would have been if Reavis were tried separately *after* Roane's trial concluded. We find that the district court did not abuse its discretion in denying Reavis' motion to sever the trials.

■ "The grant or denial of a motion for severance ... is within the trial court's discretion and will not be overturned absent a clear abuse of that discretion." *United States v. West*, 877 F.2d 281, 287–88 (4th Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989). The party moving for severance must establish that actual prejudice would result from a joint trial, *United States v. Brooks*, 957 F.2d 1138, 1145 (4th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992), and not merely that "a separate trial would offer[ ] a better chance of acquittal." *United States v. Spitler*, 800 F.2d 1267, 1271 (4th Cir.1986). We will only find an abuse of discretion "where the trial court's decision to deny a severance 'deprives the defendant of a fair trial and results in a miscarriage of justice.'" *United States v. Rusher*, 966 F.2d 868, 878 (4th Cir.1992) (quoting *United States v. Becker*, 585 F.2d 703, 706 (4th Cir.1978)).

■ We continue to adhere to the well-established principle that defendants who are charged in the same criminal conspiracy should be tried together. *See Zafiro v. United States*, —— U.S. ——, ——, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993); *Brooks*, 957 F.2d at 1145; *United States v. Parodi*, 703 F.2d 768, 779 (4th Cir.1983). Joint trials are favored in those cases in which defendants have been indicted together for the sake of judicial economy. *Rusher*, 966 F.2d at 877; *United States v. McManus*, 23 F.3d 878, 883 (4th Cir.1994). A defendant's attempt to have her trial severed from that of a co-defendant is far less likely to succeed when the request is based on the asserted need for a co-defendant's testimony. Under such a

scenario, the moving defendant must establish four things:

(1) a bona fide need for the testimony of his co-defendant;

(2) the likelihood that the co-defendant would testify at a second trial and waive his Fifth Amendment privilege;

(3) the substance of his co-defendant's testimony; and

(4) the exculpatory nature and effect of such testimony.

*Parodi*, 703 F.2d at 779.

■ Because of the conditional nature of Roane's offer to testify, Reavis is unable to satisfy the second element of the *Parodi* test.

"Severance is not required when the co-defendant would testify only if his case came first." *Rusher*, 966 F.2d at 878. Were we to accede to the co-defendant's demand, we would "create a situation where, following his own trial, the witness would be more inclined to 'throw a bone' to his codefendants by testifying favorably to them because his own case had been disposed of and he had little to lose by testifying." *Becker*, 585 F.2d at 706. The second prong of the *Parodi* test is not satisfied where a co-defendant places conditions on his willingness to testify. *Parodi*, 703 F.2d at 779. Roane's counsel expressly stated at the motions hearing that "if Ms. Reavis were tried in a ... separate trial later, my client would testify." Roane never offered to testify irrespective of the order in which he and Reavis were tried. We will not grant a severance when doing so would allow co-defendants "to obtain benefits that they would not have but for their joint indictment." *Id.* at 780 (quoting *Becker*, 585 F.2d at 706).

A severance motion will not be granted unless the moving party demonstrates that her co-defendant's testimony would be more than a "vague and conclusory statement ... of purely cumulative or negligible weight or probative value." *Parodi*, 703 F.2d at 780. The movant's showing in this regard must be sufficiently definite so that the trial court can evaluate the "exculpatory nature and effect" of the co-defendant's potential testimony. *Id.* Here, the handful of remarks made by Roane regarding Reavis' involvement in the

conspiracy would have had virtually no exculpatory effect at trial. On April 28, 1992, Roane wrote Reavis a letter from jail in which he told Reavis "I know you didn't know about no killing's [sic]." Such testimony, on Roane's part, would have had a potentially exculpatory effect had Reavis been facing a murder charge. Reavis, however, was only facing drug conspiracy charges. Nothing in Roane's letter suggests that Reavis was equally innocent with respect to the gang's drug activity. Beyond the single line in Roane's letter to which Reavis repeatedly cites in her briefs, Reavis failed to present this court or the district court with any specific information Roane could have supplied affecting the outcome of Reavis' trial. Roane supposedly was prepared to present "some extremely specific information" about his lack of a drug-related relationship with Reavis. Roane's counsel admitted, however, that "[t]his information had been given in extremely general terms." Reavis failed to present anything other than vague and conclusory statements by Roane that could have been used to buttress her defense.

Applying the principles outlined in *Parodi*, we find that the district court's denial of the motion for severance did not constitute reversible error. Roane's offer to testify was conditioned on being tried first, the district court did not possess enough information from which it could have concluded that Roane's testimony would have had an exculpatory effect, and Reavis has made no affirmative demonstration that she was deprived of a fair trial by the denial of her severance motion.

## B.

Reavis' other claim on appeal is that she is entitled to a reduction in her offense level because she should have been classified either as a minimal or minor participant in the drug conspiracy. On appeal, we review for clear error a district court determination concerning a defendant's role in the criminal offense.[1] *United States v. Daughtrey*, 874

---

1. Whether we possess the necessary jurisdiction to review a district court's refusal to adjust a defendant's sentence under the Sentencing Guidelines is an issue that has troubled this Court in the recent past. As oral argument in this case indicated, there appears to be some confusion as to whether the rule articulated in *United States v. Bayerle*, 898 F.2d 28 (4th Cir.), *cert. denied*, 498 U.S. 819, 111 S.Ct. 65, 112 L.Ed.2d 39 (1990), applies when a defendant appeals a district court's decision not to adjust her sentence to take into account aggravating or mitigating factors. In *Bayerle*, we held that this court generally does not possess the jurisdiction to review a district court's refusal to depart downward from the Sentencing Guidelines. Recent decisions of this court, however, appear to have blurred the line between how we handle downward departures under *Bayerle* and how we treat adjustments in criminals' offense levels. *Compare United States v. Patterson*, 38 F.3d 139, 146 (4th Cir.1994) (applying *Bayerle* and dismissing portion of appeal for lack of jurisdiction where district court refused to "depart downward" under section 3B1.2) *with United States v. Darby*, 37 F.3d 1059, 1068 (4th Cir.1994) (reviewing for clear error district court's refusal to accord defendant a two-level reduction in his offense level for acceptance of responsibility under section 3E1.1). Sentence adjustments and downward departures are distinct concepts that are to be treated separately even within the same case. *See, e.g., Darby*, 37 F.3d at 1067–68 (issue of 3E1.1 adjustment for acceptance of responsibility reviewed for clear error and treated as

distinct from issue of downward departure for "single act of aberrant behavior" analyzed under *Bayerle* and dismissed for lack of jurisdiction).

This Court determined in *Bayerle* that 18 U.S.C. § 3742(a) precludes a criminal defendant from seeking review of a sentencing court's discretionary decision not to depart downward, but never extended that rule to the area of sentence adjustments under the Guidelines. *Bayerle*, 898 F.2d at 30–31. The only instance in which a district court's refusal to depart is reviewable is when that decision is based on "the district court's mistaken view that it lacked the authority to depart." *Id.* at 31. Here, nothing in the record suggests that the district court considered itself powerless to depart from the Sentencing Guidelines. The court simply concluded that it would be inappropriate, in light of Reavis' significant participation in the drug conspiracy, to label her as a minimal or minor participant.

Other circuits have distinguished between "downward departures" that are rooted in section 5K of the Sentencing Guidelines and offense level adjustments that are found in section three of the Guidelines. With respect to adjustments made under section 3B1.2, in particular, the circuits agree that the judgments of district courts *are reviewable* either for clear error or for an abuse of discretion. *See, e.g., United States v. Davis*, 36 F.3d 1424, 1436 (9th Cir.1994) (clear error); *United States v. Neal*, 36 F.3d 1190, 1211 (1st Cir.1994) (same); *United States v. McCoy*, 36 F.3d 740, 743 (8th Cir.1994) (same); *United States v. Bolin*, 35 F.3d 306, 310 (7th Cir.1994) (same); *United States v. Mitchell*, 31 F.3d 271,

F.2d 213, 219 (4th Cir.1989) (determination that defendant was neither minimal nor minor participant is a factual question and due deference requires affirmance unless clearly erroneous); 18 U.S.C. § 3742(e).

■ Under section 3B1.2 of the Sentencing Guidelines, a sentencing court may reduce the offense level of a minimal or minor participant in a conspiracy. Subsection 3B1.2(a) provides for a four-level decrease in the offense level of "minimal" participants—those persons "who are plainly among the least culpable of those involved in the conduct of the group." U.S.S.G. § 3B1.2, comment (n.1). A defendant's lack of understanding of the scope, structure and activities of the conspiracy is indicative of a role as minimal participant. *Id.* Classification as a minimal participant, for the purposes of downward adjustment, is to be used infrequently. *Id.* § 3B1.2, comment (n.2). A defendant is not entitled to "minimal" participant status unless she has had an extremely limited role in a criminal enterprise. *See id.* (downward adjustment for a minimal participant "would be appropriate, for example, for someone who played no other role in a very large drug operation than to offload a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs"). The allowable downward adjustment for a "minor" participant is two offense levels. *Id.* § 3B1.2(b). "[A] minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." *Id.* § 3B1.2, comment (n.3). When a defendant's conduct falls between that of a "minimal" and "minor" participant, a three point reduction is appropriate. *Id.* § 3B1.2.

■ Reavis claims that she had a lesser role in the drug conspiracy than fourteen other people and, on that basis, concludes that she is entitled to a reduction in her offense level. We have held, however, that courts not only compare the defendant's culpability to that of other participants, but also "measur[e] each participant's individual acts and relative culpability against the elements of the offense of conviction." *Daughtrey,* 874 F.2d at 216. At the sentencing hearing, however, defense strategy was merely to repeat that "Sandra Reavis was far less culpable than almost all other participants in this case." Such a statement, even if accurate, fails to satisfy the burden of proof that Reavis carries to convince the district court by a preponderance of the evidence that she is entitled to a reduction in her offense level. *United States v. Gordon,* 895 F.2d 932, 935 (4th Cir.1990).

After considering all the evidence presented at trial, the district court specifically found that Reavis was not a minimal participant. According to the district court, there was "nothing to indicate ... that Ms. Reavis was less culpable than most of the participants in this particular conspiracy." Reavis' involvement in this drug conspiracy was certainly more substantial than either of the two examples offered in application note two of the Sentencing Guidelines. Witnesses indicated that Reavis was involved in the possession, distribution, and sale of crack cocaine. One of the detectives who testified for the government knew that Reavis was in the business of selling crack cocaine and that she had gotten the drugs from James Roane, one of the partners in the drug conspiracy. Two other witnesses stated that they had been asked by leaders of the drug ring to deliver drugs to Reavis' home. On one occasion, Reavis wired money to one of her co-defendants to help him avoid detection by the police.

Reavis' counsel suggests that his client's only connection to the conspiracy was her romantic tie to co-defendant James Roane, but concedes that evidence linked Reavis to the distribution of cocaine. Defense counsel's only response to such evidence was to assert that the evidence was "vague and contained no specific dates, times, or quantities

278 (5th Cir.1994) (same); *United States v. Aponte,* 31 F.3d 86, 88 (2d Cir.1994) (abuse of discretion). This willingness to review district courts' section 3B1.2 decisions has not translated into a similar acceptance of jurisdiction in the

downward departure context. *See, e.g., United States v. Tucker,* 892 F.2d 8, 10–11 (1st Cir.1989); *United States v. Franz,* 886 F.2d 973, 981–82 (7th Cir.1989); *United States v. Colon,* 884 F.2d 1550, 1552 (2d Cir.1989).

of cocaine." The district court's determination was essentially a factual one that we refuse to disturb unless clearly erroneous. Applying this standard, we hold that the district court decision that Reavis was not entitled to an adjustment in her offense level did not constitute clear error. Accordingly, Reavis' sentence is affirmed.

### III.

Thomas appeals his convictions on two grounds. First, he claims that delays in the commencement of his trial resulted in a violation of the Speedy Trial Act ("Act"). Second, Thomas contends that insufficient evidence existed to convict him on four of the counts of murder and on three counts of maiming in aid of racketeering. Neither the Speedy Trial argument nor the attacks on the sufficiency of the evidence merit a reversal of Thomas' convictions. Accordingly, we affirm the judgment of the district court denying Thomas' motion to have the indictment dismissed.

### A.

We review the legal conclusions in the district court's interpretation of the Speedy Trial Act de novo, *United States v. Wright,* 990 F.2d 147, 148 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 199, 126 L.Ed.2d 157 (1993) (citing *United States v. Ortega–Mena,* 949 F.2d 156, 158 (5th Cir. 1991) ), and review the district court's factual findings relating to the Act for clear error.[2] *Ortega–Mena,* 949 F.2d at 158.

The relevant provision of the Speedy Trial Act is clear. It states that:

> In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date ... of the information or indictment.

18 U.S.C. § 3161(c)(1). Generally, if a defendant is not brought to trial within seventy days, the court must dismiss the indictment on the defendant's motion. *Id.* § 3162(a)(2). "The requirement of dismissal, however, is not absolute." *Wright,* 990 F.2d at 148 (reaching same conclusion under section 3161(b) where indictment must be filed within thirty days of arrest). Certain delays are excludable when computing the time within which a defendant's trial must commence. *Id.* § 3161(h)(1)-(9); *Wright,* 990 F.2d at 148.

The most relevant of these exclusions, for the purposes of this appeal, is the one that allows the district court to grant a continuance on the basis of its finding that "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." *Id.* § 3161(h)(8)(A). Thomas's original trial date of July 6, 1992 fell within the Speedy Trial Act's seventy day period but had the effect of severing his trial from that of his co-defendants who were to be tried in September 1992. Although a two month postponement in Thomas' trial would have had the effect of violating the Act's seventy day requirement, the government moved for a continuance in the hope of avoiding multiple trials. In de-

---

**2.** Appellant focused solely on his statutory right to a speedy trial as outlined in the Speedy Trial Act and never asserted a violation of his Sixth Amendment right to a speedy trial. Even if Thomas had made the additional constitutional argument, we could not conclude that the delay between indictment and trial constituted a denial of the right to a speedy trial. In *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court outlined four criteria that are relevant in weighing a defendant's constitutional right to a speedy trial: the length of the delay, the reason for the delay, defendant's assertion of his right to a speedy trial, and the prejudice, if any, the defendant suffered by the delay. *Id.* at 530, 92 S.Ct. at 2191–92. Importantly, the Court stated that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex con-

spiracy charge." *Id.* at 531, 92 S.Ct. at 2192. This case certainly falls into the latter category. Thomas had been indicted for conspiracy, operation of a continuing criminal enterprise, murder in furtherance of a continuing criminal enterprise, illegal use of a firearm, violent crimes in aid of racketeering, and possession with intent to distribute crack cocaine—the type of complex charges that would justify delay under *Barker.* The district court's issuance of a continuance was also motivated, in part, by concern for the safety of government witnesses who had reason to fear for their safety in light of the drug ring's extreme violence. Finally, Thomas is unable to demonstrate that the delay impaired his ability to mount a defense. *Id.* at 532, 92 S.Ct. at 2193; *United States v. Valenzuela-Bernal,* 458 U.S. 858, 869, 102 S.Ct. 3440, 3447, 73 L.Ed.2d 1193 (1982).

ciding whether to grant the motion for a continuance, the district court properly considered the four factors listed in section 3161(h)(8)(B). Most relevant to this case is the second of those four factors, which asks "[w]hether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section." *Id.* § 3161(h)(8)(B)(ii). In a case with six defendants, eight attorneys, a thirty-three count indictment, and the possibility of prosecution under a seldom-used federal death penalty statute, if the district court determines that the ends of justice will be served by granting a continuance, we are reluctant to conclude that the Speedy Trial Act has been violated. *See also United States v. Chalkias,* 971 F.2d 1206, 1211 (6th Cir.1992). Thomas also fails to provide any explanation as to how the issuance of the continuance constituted a miscarriage of justice under section 3161(h)(8)(B)(i). Other than the fact that his trial did not begin within the statutorily prescribed seventy days, Thomas does not offer any concrete examples of how he was prejudiced by the delay. This was an extremely complex case, and the district judge, after considering the text of the Speedy Trial Act and the legislative history supporting the section 3161(h)(8) exclusions, did not commit clear error in determining that the circumstances warranted the grant of a continuance.

On these facts, we find that Thomas has not established either an unreasonable delay by the prosecution, given the complexity of the case, or a showing of prejudice to his defense. Accordingly, we find that Thomas' rights under the Speedy Trial Act were not violated.

### B.

Thomas contends that insufficient evidence existed to convict him on four of the counts of murder and on three of the counts of maiming in aid of racketeering. Thomas makes three independent sufficiency arguments, all of which are reviewed under the familiar standard recently articulated in *United States v. Baker,* 985 F.2d 1248 (4th Cir.1993), *cert. denied, Blackwell v. United States,* — U.S. —, 114 S.Ct. 682, 126 L.Ed.2d 650 (1994):

> The relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether, viewing the evidence in the light most favorable to the government, *any* rational trier of facts could have found the defendant guilty beyond a reasonable doubt.

*Id.* at 1251 (quoting *United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir.1982)). Thomas does not satisfy this burden, and his convictions on all of the murder and maiming counts are affirmed.

In evaluating the sufficiency of the evidence to support a conviction, we do not review the credibility of the witnesses. *United States v. Saunders,* 886 F.2d 56, 60 (4th Cir.1989). Thomas's primary criticism of the evidence linking him to the murder of Louis Johnson, however, is that it came from unreliable sources—two of his codefendants. One of those defendants, Jerry Gaiters, testified that he specifically saw Thomas pull a gun from his pocket and shoot Johnson in the head. A second witness testified that Thomas and two of his co-defendants shot Johnson. Furthermore, the government spent considerable energy demonstrating that, at the very least, Thomas aided and abetted the murder of Johnson and that he, therefore, could be convicted as a principal regardless of whether he fired the fatal shot. 18 U.S.C. § 2. According the benefit of all reasonable inferences to the government, we conclude that a rational trier of fact could have found Thomas guilty beyond a reasonable doubt based on the eyewitness testimony of two individuals.

With regard to his convictions for the murder of Torrick Brown and the maiming of Martha McCoy, Thomas again argues that the government's case against him is less credible because it "relied heavily on the weight of the evidence from Hardy," a member of the drug ring. To the contrary, the jury had more than Hardy's testimony to use as the basis for its decision. The record

reveals that Thomas was one of three members of the drug ring who went to Torrick Brown's house on February 1, 1992; that Thomas was armed when he approached the house; that the gun used to kill Brown and to maim McCoy was seized from the house in which Thomas was arrested the following day; and that Thomas told a co-conspirator on the phone that he wanted McCoy killed because she could identify him as one of Brown's killers. Our review of Thomas' conviction on sufficiency of the evidence grounds encompasses circumstantial as well as direct evidence. *Baker*, 985 F.2d at 1251. We hold that the jury was presented with sufficient evidence to justify a return of guilty verdicts as to the murder of Brown and the maiming of McCoy.

■ Thomas' third challenge on sufficiency grounds concerns his convictions for the murders of Linwood Chiles and Curtis Thorne and for the maiming of Priscilla and Gwendolyn Greene. Thomas' counsel concedes that Thomas wanted Chiles "quieted," but argues there was not enough evidence to prove that Thomas participated in the criminal activity. The fact that Thomas was in jail at the time of these murders and maiming does not, by itself, prevent a jury from concluding that he was heavily involved in the planning of these criminal acts. As we have previously noted, we accord the benefit of all reasonable inferences to the government and circumstantial, as well as direct, evidence is to be considered. *Tresvant*, 677 F.2d at 1021.

A series of conversations that Thomas had with other members of the drug ring offers substantial evidence of Thomas' involvement in the planning of the Chiles and Thorne murders. Sterling Hardy, a member of the Richmond drug ring, had told Thomas that Chiles would be testifying against Thomas. At trial, Hardy recounted his discussion with Thomas:

I told Anthony [Thomas] that Linwood [Chiles] was supposed to be testifying against all of us and Anthony said don't worry about that, he will take care of it.

He said that "C.O." and "Whitey" would take care of it for him.

"Whitey" and "C.O.," the street names of Tipton and Johnson, were eventually arrested for the murders of Chiles and Thorne. Valerie Butler, Cory Johnson's girlfriend, testified that she was part of a three-way conversation in which she heard Johnson tell Thomas that Johnson would "take care" of Martha McCoy. In order to reassure Thomas, Johnson asked Thomas "[d]idn't I do what you asked me to do for Linwood and them?" This phone conversation, although not direct evidence of Thomas' involvement in the murders, is the type of circumstantial evidence that would justify a rational trier of fact in concluding that Thomas—although physically confined in jail—continued to play a critical role in the Richmond gang's violent activities.

## C.

■ Thomas argues that the district court erred in not dismissing his section 846 conspiracy conviction, given that he was also convicted of operating a continuing criminal enterprise (CCE) in violation of 21 U.S.C. § 848. The underlying crimes used to support the CCE charge in Count II were Thomas' violations of sections 841 and 846 of Title 21 of the United States Code. Under Count I he was also convicted for the same conspiracy in violation of section 846. This Court has recognized that "[a] defendant convicted under § 848 may not also be convicted for any predicate conspiracy charges proved as elements of the § 848 offense. 'Congress did not intend that an individual be punished under both § 846 (conspiracy) and § 848 (continuing criminal enterprise).'" *United States v. Butler*, 885 F.2d 195, 202 (4th Cir.1989) (quoting *United States v. Porter*, 821 F.2d 968, 978 (4th Cir.1987), *cert. denied*, 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988)). Because the superseding indictment referenced the section 846 conspiracy charge as a predicate offense of the CCE conviction, Thomas' conspiracy conviction under Count I must be vacated. *United States v. McManus*, 23 F.3d 878, 884

(4th Cir.1994). We note, however, that vacating Thomas' section 846 conviction amounts to nothing more than a technicality. Our principal concern under *Butler* is avoiding the punishment of defendants under sections 846 and 848. Here, Thomas received a life sentence as to his CCE conviction, but was not sentenced for his section 846 conspiracy conviction.

The district court acted properly in allowing both the CCE and conspiracy convictions to stand. Had Thomas appealed his conviction for operating a CCE, and had we found merit in such an appeal and overturned the conviction, sentencing under section 846 would not have violated *Butler*'s pronouncement. Although Thomas' sentence will not be affected by vacating his section 846 conviction, the conspiracy conviction cannot stand in light of Thomas' CCE conviction. Accordingly, this case is remanded with instructions to the district court to vacate Thomas' conviction on Count I of the indictment.

### IV.

Reavis' and Thomas' convictions are hereby affirmed with the exception of Thomas' section 846 conspiracy conviction, which we remand to the district court with instructions to vacate.

No. 93–5329—*AFFIRMED*.

No. 93–5542—*AFFIRMED IN PART AND REMANDED WITH INSTRUCTIONS*.